UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. |
| : | |
| CHO YAN NATHAN MAN, : | |
|   Also known as : | |
|   NATHAN MAN, : | |
|     Defendant. : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David G. Jackson, being duly sworn, state as follows:

1. I am a Special Agent with Homeland Security Investigations ("HSI"). I have been so employed since June of 2006.

2. As part of my duties as a Homeland Security Investigations Special Agent, I investigate criminal violations relating to national security offenses concerning export controls and counter-proliferation. This affidavit is made in support of a criminal complaint alleging that CHO YAN NATHAN MAN violated 22 U.S. Code § 2778 (violations of the Arms Export Control Act) and 22 C.F.R. §§ 121.1 and 127.1(e) (the International Traffic in Arms Regulations). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of this criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense(s) alleged in the complaint.

3. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

## THE ARMS EXPORT CONTROL ACT

4. In furtherance of the national security and foreign policy of the United States, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, regulates and restricts the sale of arms, munitions, and implements of war, i.e., "defense articles."

5. Pursuant to the authority granted in the AECA, the Directorate of Defense Trade Controls ("DDTC") of the U.S. Department of State promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130. The ITAR govern the export of "defense articles" and contains the United States Munitions List ("USML"), 22 C.F.R. § 121.1, which designates certain items as "defense articles."

6. "Defense articles," as that term is used in 22 U.S.C. § 2778(b)(2) and the ITAR, means items, including technical data, designated for placement on the USML as weapons, weapons systems, munitions, aircraft, associated equipment, and other implements of war.

7. A person or entity seeking to export from the United States "defense articles" must receive a license or other approval from the DDTC, located in the District of Columbia. In the application for an export license, the exporter is required to state, among other things, the nature of the defense articles to be exported, the end recipient of the defense articles, and the purpose for which the defense articles are intended. These factors and others assist the DDTC in determining whether the export of the defense articles would further the security and foreign policy interests of the United States.

8. As defined in 22 CFR § 121.1, USML Category I defense articles include, inter alia: Non-automatic and semi-automatic firearms to .50 caliber inclusive (12.7 mm), including but not limited to, rifles, carbines, handguns, pistols, and revolvers, as well as "[c]omponents, parts, accessories, and attachments." USML Category XII defense articles include, inter alia: binoculars,

bioculars, monoculars, goggles, or head or helmet-mounted imaging systems, including but not limited to, those which employ an autogated third generation image intensifier tube or a higher generation image intensifier tube. USML Category XII defense articles also include, inter alia: Weapon sights or aiming or imaging systems, specially designed to mount to a weapon and also incorporating an infrared laser having a wavelength exceeding 710 nm. USML Category XVIII defense articles include, inter alia: Systems or equipment that, other than as a result of incidental, accidental, or collateral effect, cause ocular disruption or blindness.

9. Under the AECA and the ITAR it is a crime to willfully export, attempt to export, or conspire to export, a defense article without a license. 22 U.S.C. § 2778(c); 22 C.F.R. § 127.1(e).

10. As set forth below, there is probable cause to believe that MAN has willfully attempted to export, and caused the export of, one or more defense article(s) from the United States, subject to the ITAR, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(e).

**RELEVANT INDIVIDUALS AND ASSOCIATED ENTITIES**

11. CHO YAN NATHAN MAN is a citizen of the People's Republic of China ("China") who is believed to reside in Hong Kong.

12. Individual A is a U.S. citizen residing in Illinois.

13. Website A is a popular online auction site.

14. Forwarder A is a freight forwarder located in Jamaica, New York, whose address has been used by MAN for the shipment of U.S. goods.

15. Employee A is a person who works for Forwarder A.

16. Account A is the email account associated with MAN's account with Website A.

17. Company A is a company based in China that has used Forwarder A's services in order to provide United States addresses to receive parcels on behalf of MAN.

18. Company B is a company based in the United States that sells weapons, accessories, and hunting gear online, among other items.

19. Forwarder B is a freight forwarding company located in Hillsboro, Oregon, whose address has been used by MAN for the shipment of U.S. goods.

20. Website B is a major online financial services company that often handles payments for purchases made on Website A.

21. Forwarder C is a freight forwarder with locations in the United States. According to Forwarder C's website, they specialize in providing U.S. addresses so that individuals overseas can shop from U.S. online stores.

## INTRODUCTION

22. From in or around February 2014 to in or around January 2019, MAN willfully attempted to export, and/or willfully caused the export of, the following items that have been determined to be USML defense articles: (1) a Glare Mout Plus, which is a non-lethal visual disruption laser (also called a dazzler) used to hail and warn individuals approaching a restricted or controlled area; (2) an enhanced night vision goggle, which combines night vision and thermal imaging and which was manufactured by a United States company; (3) a four-prong muzzle adapter for a rifle that was manufactured by a United States company; and (4) a weapon aiming laser, that is, a laser that attaches to a rifle and is used for aiming that weapon. MAN also has sought to export or cause the export of other weapons-related items, such as a weapon sight, a night vision scope, a laser dot system for a gun, a rifle scope, a thermal imaging monocular (used to identify targets by heat signature), and military-use lasers. MAN's knowledge of the applicable export restrictions is shown below through the many emails he has received from sellers who have told MAN that the products he seeks are prohibited for export from the United States and/or

required an export license for international shipment. MAN's responses to the sellers have included providing false information, such as falsely claiming he was located in the United States or falsely claiming to the freight forwarder that the goods he sought to export were toys and other commercial items, as well as using one or more freight forwarding companies with locations in the United States to hide from the seller that the defense articles he purchased were to be exported from the United States.

## FACTS SUPPORTING PROBABLE CAUSE

### Attempted Export of and Causing Export of Defense Articles Without a License

23. In or around November 2018, the Defense Criminal Investigative Service ("DCIS") became aware that Individual A was offering two Glare Mouts for sale on a popular online auction site, Website A.

24. According to its manufacturer, the Glare Mout is a non-lethal visual disruption laser (also known as a dazzler), which is used to hail and warn individuals approaching a restricted or controlled area in an effort to forestall an alarming response. According to information that DCIS obtained from the Glare Mout's manufacturer, the item is sold only to military units or to authorized distributors who then sell only to military end-users. Furthermore, when no longer needed by the United States military, the military assigns the device a demilitarization code that requires it to be destroyed. Therefore, according to the manufacturer, any Glare Mouts found outside of the Department of Defense supply chain were likely stolen. Glare Mouts are manufactured in the United States.

25. On or about November 21, 2018, agents from DCIS and HSI interviewed Individual A at his residence. During the interview, Individual A admitted to having two Glare Mouts at the residence, which Individual A voluntarily relinquished to the agents. One of them was a Glare

Mout and the other was a Glare Mout Plus, which is a newer model with a more powerful laser and thus a longer range than the standard Glare Mout. Each bore a label indicating that the product was intended only for use by the Department of Defense. Photographs of those labels taken by the agents appear below (the Glare Mout Plus is depicted in the photo on the left and the Glare Mout is depicted in the photo on the right):



25.     During the interview, Individual A claimed to be unaware that the items were not for civilian use and admitted to having already shipped two additional Glare Mouts to other buyers.

26.     Several days after the above-described interview and recovery of the two Glare Mouts, agents conducted inquiries in a commercial database, which indicated that Individual A may have sold a Glare Mout to a person located outside the United States. Based on prior investigations, agents knew that the Glare Mout was listed on the USML and thus required a license from the U.S. Department of State before it could be exported lawfully from the United States.

27.     According to information provided by Website A, Individual A's auction of a Glare Mout Plus for approximately $1,126 closed on or about November 21, 2018, with a sale to an

individual named NATHAN MAN who used the user name "database_9999" on Website A. Agents viewed the listing that Individual A posted on Website A and observed that Individual A had stated that the item was not for sale outside the United States. Records from Website A indicated that MAN was located in Hong Kong, although the Glare Mout Plus was to be shipped to an address in Jamaica, New York.[1] Open source research revealed that the Jamaica, New York address belonged to a freight forwarder, Forwarder A.

28. In a Regulatory Review Letter issued on January 28, 2019, the DDTC determined that the Glare Mount Plus was and is a defense article controlled under Category XVIII(a)(1)(v) of the USML and that a license or other approval was required pursuant to the ITAR prior to any export.

29. On or about January 17, 2019, agents in New York interviewed an employee of Forwarder A (Employee A). In summary, Employee A stated that Forwarder A was used by customers who wanted an address in the United States to use for purchasing items online. Employee A further stated that MAN's name was assigned a particular customer identification number and that Forwarder A would re-ship any parcels received with that identification number to Hong Kong. According to Employee A, MAN used Forwarder A on three occasions in 2018 to send items to Hong Kong. Also according to Employee A, several companies around the world use Forwarder A's services in order to provide United States addresses to receive parcels. According to Employee A, in MAN's case, Forwarder A was working on behalf of Company A, a Chinese company. Employee A indicated that employees of Forwarder A were able to access Company A's database and retrieve information about customer and shipping instructions.

---

[1] In a later interview, Individual A clarified that the Glare Mout Plus sold to MAN on Website A was one of the two recovered by agents on their previous visit, and thus was never actually shipped.

According to Employee A, Company A's database indicated the parcels in MAN's shipments contained apparel, shoes, and toys.

30. Additional information from Website A revealed that MAN's account on Website A had been created in 2008 from an IP address that a WHOIS search indicated was located in Hong Kong.[2] The most recent IP address logged by Website A (in April 2018) was also located in Hong Kong, according to a WHOIS search. Also according to information provided by Website A, the email address associated with MAN's account was database.9999@gmail.com ("Account A").[3]

31. Website A also provided records listing the items purchased by MAN on Website A. Based upon their training and experience, agents believe that a number of weapon parts or accessories that appear on that list require a license for export. For example, on or about October 7, 2018, MAN purchased an enhanced night vision goggle, which combines night vision and thermal imaging and was manufactured by a United States company. This item was shipped to MAN by Forwarder A; according to Forwarder A's records, the shipment appears to have been on or about November 15, 2018.

32. In a Regulatory Review Letter issued on January 28, 2019, the DDTC determined that the enhanced night vision goggle was and is a defense article controlled under Category XII(c)(1)(i) of the USML and that a license or other approval was required pursuant to the ITAR prior to any export.

---

[2] A "WHOIS" search provides publicly available information as to which entity is responsible for a particular IP address, including but not limited to name, address, email, phone number, and administrative and technical contacts.

[3] Agents noted the similarity between MAN's username on Website A ("database_9999") and email address ("database.9999@gmail.com").

33. It was also observed that MAN had used Website A to purchase from Company B what was described as a particular weapon aiming laser on or about December 24, 2018, for $1,359. The shipping address provided by Website A for this purchase was in Hillsboro, Oregon. Law enforcement in Oregon determined that the address belonged to another freight forwarder, Forwarder B. In an interview conducted on or about January 16, 2019, an employee of Forwarder B advised that Forwarder B had received the package for MAN on January 7, 2019, and sent it to Hong Kong via an express consignment carrier. According to that same employee, MAN informed Forwarder B, through Company A, that the package contained toys and was valued at $100.

34. On or about January 17, 2019, agents learned from the express consignment carrier to which Forwarder B provided MAN's package that the shipment was en route to Hong Kong via aircraft but remained in the carrier's custody. Agents requested that the package be redelivered to the United States under 15 C.F.R. § 758.8(b)(1)[4] and 19 C.F.R. § 113.64(m)(2).[5] On or about

---

[4] Section 758.8(b)(1) provides:

> Where there are reasonable grounds to believe that a violation of the Export Administration Regulations has occurred, or will occur, with respect to a particular export from the United States, BIS, the Office of Export Enforcement, or the U.S. Customs Service may order any person in possession or control of such shipment, including the exporting carrier, to return or unload the shipment. Such person must, as ordered, … (1) Return the shipment to the United States or cause it to be returned.

15 C.F.R. § 758.8(b)(1).

[5] Section 113.64 (m)(2) provides that a bond for international carriers must contain the following condition:

> Principal agrees that it will act, in regard to merchandise in its possession on the date the redelivery demand is issued, in accordance with any [Customs and Border Protection ("CBP")] demand for redelivery made within 10 days of CBP discovery that there is reasonable cause to believe that the merchandise was exported in violation of the export control laws.

19 C.F.R. § 113.64(m)(2).

9

January 22, 2019, the carrier presented the shipment to Customs and Border Protection ("CBP") in Anchorage, Alaska, for inspection. That border search revealed that the package did indeed contain a weapon aiming laser. CBP officers detained the package. Agents subsequently seized the laser, a photograph of which appears below:



35.     In a Regulatory Review Letter issued on March 19, 2019, the DDTC determined that the laser was and is a defense article controlled under Category XII(c)(2)(iv) of the USML and that a license or other approval was required pursuant to the ITAR prior to any export.

36.     On or about January 22, 2019, agents in Oregon made a second visit to Forwarder B. At that time, an employee of Forwarder B informed agents that Forwarder B had recently received another shipment for MAN that it intended to send to Hong Kong at MAN's request. Forwarder B opened the shipment, and found a four-prong muzzle adapter for a rifle, which was manufactured by a United States company. Agents detained the item as it likely required a license for export.

37. On or about January 29, 2019, the DDTC confirmed that the muzzle adapter was controlled under category I(h) of the USML and required a license for lawful export from the United States. Agents subsequently seized the muzzle adapter, a photograph of which appears below:



38. On or about February 8, 2019, the DDTC completed a license history check on MAN, Individual A, and Forwarder B. The DDTC reported having no record that MAN, Individual A, or Forwarder B had ever applied for or received a license to export defense articles.

39. On or about February 8, 2019, the DDTC reported that Forwarder A was listed as the consignor and/or freight forwarder on several export licenses. The DDTC further reported on February 14, 2019, however, that Forwarder A had not requested or been granted a license for any exports to Hong Kong during the time period of January 2018 to the present.

40. According to records provided by Google, Account A was created on May 2, 2007, under the name Nathan Man. According to WHOIS, the IP address used to create the account was located in Hong Kong. In addition, Google provided a list of the IP addresses used to access the account between August 25, 2018, and December 16, 2018. According to WHOIS, each of those

IP addresses was located in Hong Kong. The telephone number associated with Account A had the country code for Hong Kong.

41. Website B is a major online financial services company that often handles payments for purchases made on Website A. Records provided by Website B revealed an account in the name of a Cho Yan Nathan Man that was created on November 7, 2008. According to Website B, MAN used a credit card to transfer $1,359 to Company A on December 24, 2018, for the purchase of the aiming laser described above in paragraph 33. Website B also provided a list of approximately eight different IP addresses that were used to access MAN's account during November and December 2018. According to WHOIS searches, each of those was located in Hong Kong. Therefore, it appears that MAN transferred the funds from a place outside the United States to a place in the United States.

42. On April 26, 2019, a search warrant was issued for the contents of Account A. Pursuant to that search warrant, the following emails were seized which relate to MAN's knowledge of U.S. export laws and requirements:

    a. On or about February 3, 2014, MAN received an email from Forwarder C, a freight forwarder with locations in the United States. According to Forwarder C's website, it specializes in providing U.S. addresses so that individuals overseas can shop from U.S. online stores. Forwarder C's email to MAN stated that a package that Forwarder C had received on MAN's behalf contained a weapon sight, which was prohibited for international export and thus could not be shipped outside the United States. According to those email records, MAN replied on or about February 13, 2014, and asked that the package be redirected to an address in New Jersey.

b.	On or about March 5, 2014, MAN received another email from Forwarder C. This email stated that a package Forwarder C had received on MAN's behalf contained a night vision scope, which was prohibited for international export and thus could not be shipped outside the United States. MAN replied on or about March 18, 2014, and claimed that the item did not actually contain any night vision function.

c.	On or about March 20, 2014, MAN received another email from Forwarder C. This email stated that a package that Forwarder C had received on MAN's behalf contained a laser dot system for a gun, which was prohibited for international export and thus could not be shipped outside the United States.

d.	On or about March 6, 2014, MAN emailed a firearms distributor located in Arkansas whose website indicates that it exports firearms and munitions. In the March 6, 2014 email, MAN asked if he could purchase the same weapon aiming laser that he later purchased from Company A (see paragraphs 33-35, above) and have it shipped to Hong Kong. The firearms distributor replied on or about the same day that "these products require full export approval" and that it would likely only be able to sell him a related but different product. On or about March 12, 2014, MAN emailed the firearms distributor to purchase a particular rifle part and the company replied on or about the next day that it would charge him $500 to obtain the necessary export license. The company also provided copies of the necessary documents and forms for MAN to complete, along with a copy of its "export procedures" guide. That guide described the process to obtain an export license from the U.S. Department of State. Based upon the records for Account A, there were no further communications between MAN and the firearms distributor.

e.	On or about August 19, 2014, MAN received an email from a large online shooting and hunting distributor located in Missouri. The email stated, in part, "Your

13

address has been identified as a freight forwarder, and your order has been cancelled. Products purchased from [redacted] are for use by Customers inside the United States and its territories. They are not for export outside of the United States."

  f. On or about June 4, 2015, MAN received an email from a seller on Website A. The email indicated that MAN had attempted to purchase a rifle scope and the seller saw that MAN's profile indicated that he was located in Hong Kong. The seller informed MAN that "this item is a no export item."

  g. On or about July 13, 2015, MAN received an email from Website A. The email indicated that MAN had purchased a thermal monocular for $4,000. The seller included the remark: "Nathan, I need you to send me an email saying you are a US Citizen and do not plan to export this item before I ship it." A review of Account A revealed no record of a reply by MAN to the seller, but this review did show that the seller emailed MAN through Website A again on or about the next day, stating "[I] cannot sell you the thermal scope knowing you will illegally export it. Sorry."

  h. On or about July 22, 2015, MAN emailed a French company to ask if he could purchase either of two military-use lasers made by the same U.S.-based company as the Glare Mout. The company responded on or about the same day to ask whom the purchase was for and stating that it is usually only sold to "official services." MAN replied on or about the same day asking if that meant he could not buy one individually. The French company replied on or about the same day that "the export license will be refused."

  i. On or about July 27, 2015, MAN received an email from a seller on Website A. The email stated in part, "This is in regards to the laser that you bid on. I was looking at your feedback and it says you are in Hong Kong?? The item is not available for export per

14

[Website A] rules. I also clearly stated that this item is not available for international shipping in the item description. If you would like to continue with this purchase, you must provide an address in the United States…These are the rules. I did not make them up butfor [sic] my protection I must follow them." MAN replied on or about the same day, stating in part: "Thanks for your information and I understand the ITAR rules. My address is in Jamaica, NY but [Website A] changed my base to Hong Kong some how [sic]. The item will not be shipping out form [sic] US."[6] After several more emails, the seller agreed to sell MAN the laser in a private transaction outside Website A and MAN paid the seller via Website B.

      j.      On or about January 6, 2017, MAN began a series of emails with a company located in Virginia which sells tactical communications equipment. MAN asked if he could purchase a particular cable from the company. After several emails attempting to determine exactly which product he wanted, an employee of the company informed MAN on or about July 11, 2017, that they had the product in stock and that, if it was to ship internationally, there would be an export license fee in addition to shipping costs. The company stated again in an email on or about July 17, 2017, that they could receive payment via Website B but that, if it was being shipped outside the United States, they would need an export license. MAN replied on or about the same day that it would be shipped to New York and provided them with the address of Forwarder A. The company shipped the item on or about the next day and provided MAN with the tracking number.

      k.      On or about November 21, 2018, MAN received an email from Individual A via Website A regarding his purchase of a Glare Mout. Individual A stated in part: "I

---

[6] I believe this statement to be false since a review of travel and immigration records has found no evidence that MAN has ever traveled to, let alone resided in, the United States.

15

will NOT ship this item to a freight forwarder. If you read the description, you would understand I require a physical address in the U.S. such as your HOME address, not a third party who will take the item and ship it outside of the United States."[7]

### Identification of Defendant Cho Yan Nathan Man

43.   The following emails were seized which identify the user of the email account as MAN:

    a.   On or about March 31, 2008, MAN sent an email to apply for a job. Attached to the email was his resume, which provided his name as "Man Cho Yan, Nathan," along with his date of birth.

    b.   On or about September 23, 2012, MAN sent an email to another individual with his driver's license attached. The attached image file appears to be a Hong Kong driver's license in the name of "Man, Cho Yan Nathan." There is no date of birth on the document.

    c.   On or about November 12, 2012, MAN sent an email which stated, in part: "Here attached the copy of my passport." Attached to the email was an image file of a Hong Kong passport in the name of "Cho Yan Nathan Man" and the same date of birth as described above on MAN's resume.

### CONCLUSION

44.   Based on the above evidence, along with my training and experience, I believe that CHO YAN NATHAN MAN is located in Hong Kong and has a long history of attempting to unlawfully purchase and export defense articles from the United States without the requisite export licenses. After several companies refused to export such items without a license and learning that

---

[7] This email was sent on or about the same day that Individual A was interviewed by law enforcement and may have been triggered by this interview.

16

at least one legitimate exporter would charge a license fee to obtain a license, MAN began to provide false information and use the addresses of Forwarder A and Forwarder B to deceive U.S. sellers of defense articles into believing that they were engaging in a domestic sale, and then instructed the forwarders to send him the parcels in Hong Kong, misrepresenting the contents of the parcels to the forwarders. On at least one occasion (described in paragraphs 33-35 and 42d), MAN purchased a defense article from a company located within the United States and caused it to be exported from the United States after previously being informed that the same item in question required an export license. That purchase, as well as many of MAN's other purchases, involved the transfer of funds via Website B from Hong Kong to the United States in furtherance of his unlawful export activity. I therefore respectfully submit that there is probable cause to believe that MAN committed the offense charged in this complaint.

        _____
        David G. Jackson
        Special Agent
        Homeland Security Investigations

Sworn to and subscribed before me on June 6, 2019.

        _____
        ROBIN M. MERIWEATHER
        UNITED STATES MAGISTRATE JUDGE